UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN AUSTIN MURPHY,

    Appellant,

v.

JOHN MADDEN, LIQUIDATION TRUSTEE
OF THE ENERGY CONVERSION
DEVICES LIQUIDATION TRUST,

    Appellee.

                                   /

Case No. 15-10554

Honorable Nancy G. Edmunds

**OPINION AND ORDER AFFIRMING BANKRUPTCY COURT'S JANUARY 30, 2015 ORDER DENYING APPELLANT'S REQUEST FOR PRIORITY TREATMENT OF HIS BREACH OF FIDUCIARY DUTY CLAIM**

This is an appeal from a January 30, 2015 order issued by the Bankruptcy Court in a Chapter 11 bankruptcy proceeding brought by Energy Conversion Devices ("ECD"). The Appellant, John Murphy ("Murphy"), appearing without the benefit of counsel, argues that the Bankruptcy Court erred by holding that his claim has the same priority as the equity interests identified under class 5 of the confirmed liquidation plan. According to Murphy, because his claim does not "arise from the purchase or sale of a security", it is not subject to subordination under 11 U.S.C. § 510(b) of the Bankruptcy Code. In the alternative, Murphy maintains that his claim should be treated as an allowed "administrative expense" as part of the necessary costs of preserving the estate.

For the reasons stated below, this Court finds that (1) the Bankruptcy Court properly construed and applied section 510(b) and (c) of the Bankruptcy Code, and (2) Murphy, as

an equity investor, is not entitled to an administrative expense claim stemming from a decline in stock value. The Bankruptcy Court's January 30, 2015 order is thus AFFIRMED.

## I. Jurisdiction

Appellate jurisdiction is conferred on this Court by 11 U.S.C. § 158(a)(1) which states, "[t]he district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, decrees; of bankruptcy judges under Section 157 of this title. An Appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving." This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## II. Appellate Standard of Review

This Court reviews the Bankruptcy Court's findings of fact for clear error and its conclusions of law *de novo*. *In re Baker & Getty Fin. Serv., Inc.*, 106 F.3d 1255, 1259 (6th Cir. 1997). "*De novo* means that the appellate court determines the law independently of the trial court's determination." *In re Meyers*, 216 B.R. 402, 403 (B.A.P. 6th Cir. 1998) (internal quotation marks and citation omitted). The parties agree that the issues raised in this appeal are questions of law subject to *de novo* review. (Trustee Br. 12); (Murphy Br. 2).

## III. Facts

The relevant facts giving rise to this appeal are undisputed. On February 13, 2012, ECD and its wholly-owned subsidiary, United Solar Ovonic, LLC ("USO", collectively the "Debtors"), entered into a "Plan Support Agreement" ("PSA") with a group of ECD's unsecured noteholders (the "Noteholders"). The purpose of the PSA was to memorialize the Noteholders' support for the Debtors' decision to seek bankruptcy protection under

Chapter 11 of the bankruptcy code. More specifically, the Noteholders had a vested interest in the Debtors' post-petition liquidation plan. According to the PSA, the Debtors' contemplated selling USO (the solar business) to the highest bidder to maximize creditor distributions. On February 14, 2012, the day afer the PSA was executed, the Debtors filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of Michigan.

Despite the Debtors' efforts, the bankruptcy bidding and sale process failed to achieve a going-concern sale of the solar business. Faced with this realization, the Debtors proposed selling substantially all of the business' assets in an auction format. The Bankruptcy Court agreed, finding that "conducting the auction and the consummation of the Sale constituted the exercise by the Debtors of sound business judgement and such acts are in the best interests of . . . all parties in interest." (Bankr. Ct. Doc. No. 765 at 3, Sale Order).

On June 20, 2012, the Debtors filed a joint liquidation plan consistent with the terms of the PSA. After resolving a number of objections, the Bankruptcy Court ultimately confirmed a modified version of the plan on July 30, 2012. (Bankr. Ct. Doc. No. 1064, Confirmed Plan). Under the confirmed plan, equity interests, defined as "the interest of any holder of equity securities of the Debtors . . . ." are considered only "[t]o the extent funds remain after payment in full of all Allowed Claims . . . ." (Bankr. Ct. Doc. No. 754-1 at 5, 13, Second Amended Liquidation Plan). In other words, "equity interest claims are deemed to have rejected the Plan . . . ." and are assigned the very lowest (class 5) priority. (*Id.* at 13). Indeed, according to the Bankruptcy Court's order confirming the plan "Class 5 claims will neither receive nor retain any property under the Plan . . . . " (Bankr. Ct. Doc. No. 1064 at 5).

The treatment of equity claims under the plan is one of many factors culminating in this appeal. On June 20, 2012, Appellant Murphy--a former equity shareholder of ECD--timely filed a proof of claim against ECD in the amount of $136,890 (the "Claim"). According to Murphy, the Debtors decision to file bankruptcy--and announce its liquidation plan under the PSA--was both unnecessary and imprudent, causing the value of his 117,000 shares of ECD stock to decline drastically and eventually become worthless. More specifically, Murphy maintains that ECD,

> had a fiduciary duty to [him] on the morning of [February 14, 2012], including at the time of ECD's filing of bankruptcy as well as subsequently when it announced its intention to liquidate the company in a "Planned Support Agreement" made with the ECD noteholders . . . . The fiduciary duty . . . was thus violated subsequent to the bankruptcy filing in order to carry out the bankruptcy liquidation process and thus qualifies as an administrative expense.

(Bankr. Ct. Doc. No. 1367 at 2, Murphy Proof of Claim).

On September 20, 2012, the liquidation trustee, John Madden ("Trustee"), filed an objection to Murphy's claim with the Bankruptcy Court. According to the Trustee, because Murphy's claim was "for damages arising from the purchase or sale of a security" it was subject to the same priority as a class 5 equity interest under the liquidation plan. Murphy strongly resisted this conclusion, arguing that (1) the Trustee's interpretation of § 510(b) was overly broad, (2) the claims of the Noteholders were subject to equitable subordination pursuant to § 510(c)(1), and (3) his claim should be given priority treatment as an allowed administrative expense.

On January 30, 2015, the Bankruptcy Court issued an opinion and order agreeing with the Trustee's interpretation of § 510(b), holding that:

> the type of actionable wrong alleged by ECD shareholder Murphy in this case--breach of fiduciary duty by ECD that allegedly caused a drop in the value of Murphy's stock in the Debtor--is a claim for damages that arises from Murphy's purchase of . . . ECD stock, within the meaning of § 510(b), and such claim therefore must be subordinated.

(Bankr. Ct. Doc. No. 2442 at 12, Order re Claim Number 321). In reaching this conclusion, the Bankruptcy Court adopted the majority position on this issue, finding that "subordination [under § 510(b)] is not limited to a claim for fraud or other misconduct in the actual purchase or sale transaction of stock in the debtor. Rather, the cases have broadly applied § 510(b) to claims based on acts or omissions that occurred well after the claimant purchased his stock . . . ." (*Id.* at 9). The Bankruptcy Court further denied Murphy's equitable subordination argument and found that he was not entitled to an administrative expense. This timely appeal followed.

## IV. Analysis

Murphy raises three discrete issues on appeal. First, he argues that the Bankruptcy Court erred by applying § 510(b) to his claim for breach of fiduciary duty.[1] According to Murphy, subordination under this subsection of the code "only applies to claims emanating from tainted securities laws transactions, not to actual post-petition breaches . . . that take rights/value away from shareholders." (Murphy Br. 23). Next, Murphy maintains that where, as here, the Noteholders engaged in inequitable conduct resulting in an unfair advantage, their claims must be subordinated pursuant to § 510(c)(1). Finally, Murphy contends that, in the alternative, his claim should be treated as an allowed administrative expense as a

---

[1] The Court notes that the merits of Murphy's breach of fiduciary duty claim were not addressed by the Bankruptcy Court and are not a subject of this appeal. Rather, the sole issue is whether Murphy's claim, even if substantively valid, must be subordinated to all senior interests for purposes of distribution under the liquidation plan.

5

result of ECD's refusal to "maximize the value of [the] estate to all stakeholders . . . ." (*Id.* at 5). The Court considers each in turn.

### A. Statutory Subordination Under 11 U.S.C. § 510(b)

The first issue presented in this appeal requires the Court to construe § 510(b) of the Bankruptcy Code. Section 510(b) states in relevant part:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of security of the debtor or of an affiliate of the debtor, for damages *arising from the purchase or sale or such a security*, . . . shall be subordinated to all claims or interests that are senior to or equal [to] the claim . . . .

11 U.S.C. § 510(b) (emphasis added). Here, the question is whether Murphy's breach of fiduciary duty claim "arises from" the purchase or sale of a security of ECD. According to Murphy, the operative language only applies to claims "arising" at the time of the purchase or sale of stock. In other words, Murphy reads § 510(b) narrowly, arguing that the claim must be predicated on some type of fraud or illegality in the stock's issuance to fall within the statute's purview. The Trustee, on the other hand, maintains that Murphy's claim "would not have arisen but for his purchase of stock in the company and the claim alleges damages relating specifically to his stock ownership: the Debtors' fiduciary duty breach purportedly caused [Murphy's] ECD stock value to decline." (Trustee Br. 10). In this way, the Trustee contends that "arising from" must be read broadly to encompass all claims indirectly related to the purchase or sale of a security that are based upon acts or omissions that occurred after the purchase was made. The Court finds that the Trustee has the better of these arguments.

As many courts have aptly pointed out, the phrase "arising from" in § 510(b) is, as a textual matter, ambiguous. Indeed, as the Third Circuit explained:

> For a claim to 'aris[e] from the purchase or sale of . . . a security,' there must obviously be some nexus or causal relationship between the claim and the sale of the security, but § 510(b)'s language alone provides little guidance in delineating the precise scope of the required nexus. On the one hand, it is reasonable, as a textual matter, to hold that the claims in this case do not 'arise from' the purchase or sale of [] stock, since the claims are predicated on conduct that occurred after the stock was purchased. On the other hand, it is, in our view, more natural, as a textual matter, to read 'arising from' as requiring some nexus or causal relationship between the claims and the purchase of the securities, but not as limiting the nexus to claims alleging illegality in the purchase itself. In particular, the text of § 510(b) is reasonably read to encompass the claims in this case, since the claims would not have arisen but for the purchase of Telegroup's stock . . . .

*In re Telegroup, Inc.,* 281 F.3d 133, 139 (3rd Cir. 2002); *see also In re Granite Partners, L.P.,* 208 B.R. 332, 339 (Bankr. S.D.N.Y. 1997) ("[r]easonably well-informed persons could interpret section 510(b) in either sense, and hence, the section is ambiguous."). Notwithstanding this textual ambiguity, the overwhelming majority of courts have adopted the broader reading of § 510(b) on the basis that it is most consistent with the legislative history and policy objectives underlying the statute.

In *Granite Partners*, for example, the Chapter 11 trustee sought to subordinate the fraudulent retention claims of several investors under § 510(b). 208 B.R. at 334. According to the investors, "the debtors misrepresented their performance through the use of managers' marks, and issued false operating reports which induced the[m] to hold on to their investments." *Id.* at 342. Similar to Murphy's breach of fiduciary duty claim, the investors' fraudulent retention claim had no direct link to the purchase or sale of their security in the debtor. This, according to the court, was a distinction without a difference: "[j]ust as the opportunity to sell or hold belongs exclusively to the investors, the risk of illegal deprivation of that opportunity should too. In this regard, there is no good reason to distinguish between allocating the risks of fraud in the purchase of a security and

post-investment fraud that adversely affects the ability to sell (or hold) the investment; both are investment risks that the investors have assumed." *Id.* at 342.

Several appellate courts have since adopted *Granite Partners'* reasoning in this regard. Indeed, after a thorough examination of the legislative history, the Third Circuit concluded that "Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding." *In re Telegroup*, 281 F.3d at 142. The broader policy concern here, according to the court, is that claimants' are seeking to recover losses associated with an inherently risky activity; namely, securities trading. *Id.* Put differently, "because claimants retained the right to participate in corporate profits", a ruling in their favor would "allow stockholders in claimants' position to retain their stock and share in the corporation's profits if the corporation succeeds, and to recover a portion of their investment in parity with creditors if the corporation fails." *Id.*

Moreover, at least one court has specifically applied the broader reading of § 510(b) to a claim for breach of fiduciary duty against a Chapter 11 debtor. *See In re NAL Fin. Grp., Inc.*, 237 B.R. 225, 227 (Bankr. S.D. Fla. 1999). In *NAL Financial Group*, the court, relying on the legislative analysis set forth in *Granite Partners*, was persuaded by an even more basic appeal: "[l]ogically, there can be no breach of contract without the execution of the contract. Similarly, there can be no breach of fiduciary duty without the execution of a contract that establishes the fiduciary duty . . . . " *Id.* at 231. More simply put, "there is no distinction between fraud committed during the purchase of securities and fraud (or a wrongful act) committed subsequent thereto that adversely affects one's ability to sell those

8

securities. They are both claims that arise from the purchase or sale of securities." *Id.* at 233. As the Bankruptcy Court points out, this line of reasoning--and, more specifically, the broader interpretation of "arising from"--has been adopted by at least three appellate courts in addition to the Third Circuit. *See In re Geneva Steel Co.,* 281 F.3d 1173. 1175-1182 (10th Cir. 2002) (agreeing with *Granite Partners* and subordinating post-investment claims pursuant to § 510(b)); *In re Betacom of Phoenix, Inc.*, 240 F.3d 823. 828-31 (9th Cir. 2001) (subordinating a shareholder's claim arising from the breach of a merger agreement and holding that § 510(b) is not limited to an actual purchase or sale of a security.); *In re Med Diversified, Inc.*, 461 F.3d 251, 256-57 (2nd Cir. 2006) ("[i]n conclusion, we interpret section 510(b) broadly to require subordination of the claim at issue. In reaching this conclusion, we are influenced by what appears to be the uniform determination of courts presented with similar claims that those who conclude the bargain to become investors or shareholders should be treated as such.").

Nor do the cases relied upon by Murphy persuade the Court that it should disregard the great weight of authority on this issue. In fact, in at least one of those decisions, *In re Mid-American Waste Systems, Inc.,* 228 B.R. 816, 826 (Bankr. D. Del. 1999), the bankruptcy court specifically held that "the plain language of § 510(b), its legislative history, and applicable case law clearly show that § 510(b) intends to subordinate the indemnification claims of officers, directors, and underwriters for both liability and expenses incurred in connection with the pursuit of claims for rescission or damages by purchasers or sellers of the debtor's securities." In other words, contrary to Murphy's suggestion that *Mid-American Waste Systems* restricts § 510(b) to "tainted securities law transactions", (Murphy Br. 23), it arguably has the opposite effect. As the Court observed, "because

Congress intended the holders of securities law claims to be subordinated, why not also subordinate claims of other parties (e.g., officers and directors and underwriters) who play a role in the purchase and sale transactions which give rise to the securities law claims?" *Id.* at 826. This statement--and the court's holding--only provide further support for subordinating claims having only a tangential relationship with the purchase or sale of a security.

Murphy's reliance on *In re Montgomery Ward Holding Corp.,* 272 B.R. 836 (Bankr. D. Del. 2001) is likewise misplaced. (Murphy Br. 23).[2] There, the court--while impliedly agreeing with the reasoning in *Granite Partners* as it relates to "allegations by securities holders of . . . wrongdoing by the debtor"--was faced with an entirely different issue altogether. Indeed, the "critical inquiry [was] whether a claim based solely on the nonpayment of a promissory note issued by a debtor to *consummate the repurchase* of its own stock is one for damages 'arising from' the purchase or sale of its securities.'" *Id.* at 841 (emphasis added). Here, there is no question that Murphy's claim emanates from his equity interest in ECD- not an agreement to repurchase stock at a later date. This distinction matters; *Granite Partners* and its progeny "confront an issue not implicated by a claim seeking simple recovery on a debt. These courts reason that the legislative policy that allocates the risk of securities fraud to investors demands subordination of all investor claims . . . connected to the purchase or sale of the debtor's securities, regardless of . . . which legal cause of action the claimant proceeds." *Id.* at 844. A claimant seeking simple

---

[2] The Court notes that the Third Circuit declined to follow the court's holding in *Montgomery Ward. See In re Telegroup, Inc.,* 281 F.3d 133, 137 (3rd Cir. 2002).

recovery of a debt, on the other hand, does not assume the same status as an equity investor.

In sum, this Court agrees with the conclusion originally reached by *Granite Partners.* "From the perspective of Section 510(b), it makes no difference whether the stockholder's loss in the value of his stock was caused by [] pre-purchase [or post-purchase] . . . corporate misconduct . . . . In either case, the stockholder's loss . . . ultimately constitutes a claim for damages derived from his ownership of stock and therefore 'aris[es]' from his purchase of the stock . . . . " *In re WorldCom, Inc.*, 329 B.R. 10, 16 (Bankr. S.D.N.Y. 2005) (relying on *Granite Partners*). Murphy's breach of fiduciary duty claim arises from his equity interest in ECD. Therefore, it is "a claim . . . for damages arising from the purchase or sale . . . of a security" pursuant to 11 U.S.C. § 510(b). As such, Murphy's claim shall be subordinated to the claims of the Noteholders and have the same priority as all other equity security holders (class 5) under the Debtors' liquidation plan.

### B. Equitable Subordination Under 11 U.S.C. § 510(c)(1)

Murphy argues next that the claims of the Noteholders and "ECD management" should be equitably subordinated to his pursuant to § 510(c) of the Bankruptcy Code. The crux of Murphy's argument appears to be premised on the Debtors' pre-petition PSA with the Noteholders. In essence, Murphy maintains that the Debtors' breached their fiduciary duty by announcing the PSA, which indirectly caused his equity interest to drop and improperly transferred "value" from one set of stakeholders to another. (Murphy Br. 17). Murphy also takes issue with the process leading up to the liquidation plan, arguing, *inter alia*, that (1) "ECD's majority creditors [and] the Noteholders collud[ed] with ECD's managers to carry out the PSA", (2) "there was [no] business reason or justification given

11

for ECD's fire sale", and (3) ECD management was given special and confidential compensation. (*Id.* at 17, 21-22). As discussed below, each of Murphy's equitable subordination arguments can be summarily disposed of for the same reason; namely, the failure to show that the claimants engaged in misconduct.

Under § 510(c)(1), the court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest[.]" 11 U.S.C. § 510(c)(1). The Sixth Circuit has adopted a three-part standard for establishing equitable subordination: "(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt estate or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 745 (6th Cir. 2001) (citations omitted). As a general matter, "equitable subordination is an usual remedy which should be applied in limited circumstances." *Id.* Moreover, where, as here, one group of the claimants (Noteholders) are non-insiders, the "egregious conduct must be proven with particularity. It is insufficient for the objectant in such cases merely to establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others." *In re Baker & Getty Fin. Servs., Inc.*, 974 F.2d 712, 718 (6th Cir. 1992).

Murphy's argument in support of equitable subordination fails for a number of reasons. First, with respect to the claims of the Noteholders', Murphy focuses exclusively on the allegedly improper conduct of ECD- and, more specifically, its pre-petition decision to

12

negotiate a PSA with the Noteholders. Even assuming, *arguendo*, that ECD's actions did rise to a breach of fiduciary duty to its shareholders--which is unsupported in any case--equitable subordination is warranted only to the extent that Murphy can show misconduct on the part of the Noteholders. The Debtors' decision to execute the PSA does not somehow impute inequitable conduct to the Noteholders, who, as far as the Court can tell, were merely acting in their own self-interest on the heels of the Debtors' Chapter 11 filing. Without any allegations of egregious conduct specifically linked to the Noteholders, the Court is unable to order equitable subordination of their claims.

Morever, the Court's conclusion applies with equal force to the claims of "ECD management." Indeed, the Bankruptcy Court carefully considered the propriety of the liquidation plan and specifically concluded that "Debtors have articulated good and sufficient business reasons justifying the Auction." (Bankr. Ct. Doc. No. 764 at 3, Sale Order). Once again, Murphy's argument amounts to little more than a series of vague accusations questioning ECD's business judgment. *See AutoStyle Plastics, Inc.*, 269 F.3d at 745 ("The fact that Bayer perceives the defendants' legitimate actions to be inequitable as to Bayer is not sufficient. In order to equitably subordinate a creditor's claim, the creditor-insider must actually use its power to control to its own advantage or to the other creditors' detriment.") (citations and quotations omitted). This a far cry from the type and character of allegations necessary to support a claim for equitable subordination under *AutoStyle Plastics.*

Finally, even if Murphy did establish a factual predicate for misconduct on the part of ECD management or its Noteholders, any relief under § 510(c) would be wholly inconsistent with the Court's decision to subordinate his claim under § 510(b). As

discussed, "equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." *Id.* at 744. For these reasons the Court must, and does, deny Murphy's request for equitable subordination.

### C. Priority Treatment as an Administrative Expense Claim

Finally, in a last ditch effort, Murphy argues that, rather than being subordinated, his claim should be given priority treatment under 11 U.S.C. § 507(a)(2) as part of the "actual necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(1)(A). Because Murphy has not, and seemingly cannot, articulate how his claim is a benefit to the estate, the Court denies his request for administrative expense treatment.

As a preliminary matter, the Court has already determined that Murphy's claim arises from his equity interest in ECD and must, therefore, be subordinated to all senior interests identified under the liquidation plan. For this reason alone, it would be utterly inconsistent to treat Murphy's claim as an administrative expense. Nevertheless, Murphy's claim runs directly counter to the very purpose of designating certain claims as administrative expenses.

Under the bankruptcy code, administrative claims "are, as a rule, entitled to priority over prepetition unsecured claims." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5 (2000) (citations omitted). "The purpose of [this priority] is to facilitate the rehabilitation of insolvent businesses by encouraging third parties to provide those businesses with necessary goods and services." *In re United Trucking Service, Inc.*, 851 F.2d 159, 161 (6th Cir. 1988) (citations omitted). However, "[c]laims for administrative expenses under § 503(b) are strictly construed because priority claims reduce the funds available for creditors and other claimants." *In re Federated Dept. Stores, Inc.*, 270 F.3d

994, 1000 (6th Cir. 2001). "[A] debt qualifies as an 'actual, necessary' administrative expense only if (1) it arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate." *In re Eagle-Picher Industries, Inc.*, 447 F.3d 461, 464 (6th Cir. 2006) (quoting *In re Sunarhauserman, Inc.*, 126 F.3d 811, 816 (6th Cir. 1997)).

Murphy's attempt to cast his claim as an administrative expense easily fails because he cannot possibly show a direct and substantial benefit to the estate. On the contrary, his claim rests on the presumption that the PSA caused a significant *reduction* in the overall value of the bankruptcy estate to the detriment of the shareholders. Murphy's reliance on *In re Heck's Properties*, 151 B.R. 739 (S.D. W. Va. 1992) does not change this result. There, the debtor's officers argued that their claim--associated with the cost of defending against a lawsuit filed in state court--was entitled to administrative expense priority for two reasons: first, the lawsuit stemmed from their role in approving the debtor's Chapter 11 confirmation plan, and second, the debtor's articles of incorporation expressly provided for indemnification. *Id.* at 766-68. The court agreed, finding that (1) the officers' conduct was clearly tied to post-petition activity, and (2) defending the propriety of the confirmation plan was of substantial benefit to the bankruptcy estate. The same cannot be said for Murphy's claim, which seeks to undermine the actions of ECD's officers at the expense of the bankruptcy estate.

Nor does Murphy's claim fit within the narrow exception to the "benefit to the estate" requirement identified under *Reading Co. v. Brown*, 391 U.S. 471. In *Reading,* "the Supreme Court expanded the concept of administrative expenses to include damages resulting from the estate's post-petition negligence." *In re Wall Tube & Metal Products Co.*,

831 F.2d 118, 123 (6th Cir. 1987). The Seventh Circuit explained the purpose of the *Reading* exception this way:

> A tort victim [] is a creditor, but not a creditor whose actions benefit his debtor, the tortfeasor. Yet in *Reading v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), the Supreme Court held that at least in a Chapter 11 bankruptcy, tort claims arising from the continued operation of the bankrupt business should be treated as administrative claims, like other post-petition expenses. Tort liability is an expense of doing business, like labor or material costs, and should be treated the same way. Businesses operating in bankruptcy that were excused from tort liability would have an inefficient competitive advantage over their solvent competitors—and deficient incentives to use due care in the operation of the business.

*In re Resource Technology Corp,* 662 F.3d 472, 476 (7th Cir. 2011) (citations omitted). Accordingly, *Reading* has generally been limited to post-petition claims sounding in tort, trademark and patent infringement, and breach of contract. *In re Eagle Picher Indus., Inc.*, 447 F.3d 461, 464 (6th Cir. 2006) (citations omitted).

While ECD continued to operate its business for several months after filing bankruptcy, Murphy's claim is focused exclusively on the PSA--which was negotiated pre-petition--and the Debtors' decision to liquidate the solar business. In other words, there can be no rational argument that Murphy's claim arose from the Debtors' *operation* of its business after filing bankruptcy. As such, the Court finds that the *Reading* exception has no application under these circumstances. For these reasons, the Court declines to grant administrative expense priority to Murphy's claim.

**V.  Conclusion**

For the above-stated reasons, this Court AFFIRMS the Bankruptcy Court's January 30, 2015 order.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: June 9, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 9, 2015, by electronic and/or ordinary mail.

s/Carol A. Bethel
Case Manager